# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

CENTURY SURETY COMPANY,

    Plaintiff,

vs.

CASINO WEST, INC. *et al.*,

    Defendants.

3:07-cv-00636-RCJ-RAM

**ORDER**

This case arises from a tragic accident that occurred on April 16, 2006 in which four Casino West guests were found deceased in their motel room due to carbon monoxide poisoning. Pending before the Court are Century Surety Company's ("Century") Motion for Summary Judgment (ECF No. 112) and Intervenor Admiral Insurance Company's ("Admiral") Motion for Summary Judgment (ECF No. 113). For the reasons contained herein, Century's Motion is GRANTED and Admiral's Motion is DENIED.

**I.    FACTS AND PROCEDURAL HISTORY**

On April 16, 2006, Juan Pablo Chavez, Veronica Chavez, Donna N. Vega-Robles, and Phillip Doll (collectively "the victims") were found dead in their Casino West motel room in Yerington, Nevada ("the Accident"). An autopsy of the victims revealed that they each had suffered acute carbon monoxide poisoning. (Autopsy Reports, ECF No. 112-1, Ex. 1). Further investigation at the Casino West Motel showed that "a series of problems had led to the CO

exposure." (Nev. Dep't of Safety Report, ECF No. 113-5, at AIC 0099). The heater used to warm the Motel pool was not burning properly, a roof vent was not the proper height and the cap on the vent had been removed, the vents in the door to the pool equipment room had been covered with cardboard and sealed with duct tape, and the control panel had been altered such that there was no reasonable way to shut the heating unit off without disconnecting power. (*Id.*). Investigators believed that "the combination of these factors had allowed the CO gas to build to a high level." (*Id.*).

When investigators attempted to recreate the fatal conditions in the motel room where the victims passed away, they were unable to do so. (Carbon Monoxide Detection Report, ECF No. 113-6, at AIC 0411). Since one of the victims had lost consciousness while in the bathtub, running water had spilled over onto the floor of the room, which eventually caused it to buckle and seal out additional carbon monoxide fumes. Investigators believed it was for this reason that the dangerously high levels of carbon monoxide in the victims' room could not be recreated. (*Id.* at AIC 0412).

On November 6, 2007 and April 14, 2008, the victims' next-of-kin sued Casino West in state court in two different lawsuits.[1] In their complaints, the plaintiffs alleged that Casino West negligently maintained and monitored the pool equipment room thereby directly causing the decedents' deaths. (*Duenas* Compl. ¶¶ VII, VIII, ECF No. 113-3; *Kitamura* Compl. ¶¶ XI, XII, ECF No. 113-4). The plaintiffs also claimed that Casino West "failed and refused to observe minimal safety precautions." (*Duenas* Compl. ¶ XI, *Kitamura* Compl. ¶ XV). Casino West settled both of these cases as well as all other outstanding claims relating to the Accident.

---

[1] The November 6, 2007 lawsuit was filed by Rafael Chavez Duenas, Maria Ofelia Chavez, and Diana Ofelia Chavez, as a special administrator for the estate of Juan Paublo Chavez, in Washoe County District Court. (*Duenas* Compl., ECF No. 113-3). The April 14, 2008 lawsuit was filed by Nobuko Kitamura, individually and as guardian-ad-litem of Christian Vega Robles, and Matthew Sharp, as special administrator for the estate of Donna N. Vega-Robles, in Lyon County District Court. (*Kitamura* Compl., ECF No. 113-4).

At the time of the Accident, Century provided Casino West with general liability insurance ("the Policy"). The Policy requires that Century cover "bodily injury" that is caused by an "occurrence" that takes place during the Policy period. (Century Policy § I.1.b, ECF No. 113-1, at AIC 0052). "Occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (*Id.* at AIC 0046). The Policy also limits coverage to $1,000,000 for each "occurrence." (*Id.* at AIC 0034). It further states that this limit applies regardless of the number of claims made or suits brought and that the limit extends to damages for bodily injury arising out of any one "occurrence." (*Id.* §§ III.1.b, III.5, at AIC 0060). The Policy, however, has an aggregate limit of $2,000,000 if the damages at issue arise from more than a single occurrence. (*Id.* at AIC 0034).

In addition to the general liability insurance, Casino West also obtained an excess policy of insurance from Admiral ("the Excess Policy"), with a limit of $5,000,000, which was in effect at the time of the Accident. The Excess Policy applies only once the aggregate amount of all limits of the insured's "Underlying Insurance" have been exhausted "by payment of judgments, settlements, costs or expenses." (Admiral Policy § I.1.a, ECF No. 113-2, at AIC 0013).

On July 30, 2014, Century paid the "occurrence" limit, plus interest, for a total amount of $1,153,235, to Casino West as reimbursement for settlement payments. (Galt Aff. ¶ 7, ECF No. 112-1). Century also paid $125,157 in partial satisfaction of a stipulated judgment. (*Id.*). Nevertheless, additional sums are owing to the plaintiffs in both lawsuits.

Century and Admiral filed cross-motions for summary judgment on the issue of whether the victims' deaths on April 16, 2006 arose from a single "occurrence" or more than one "occurrence" as defined by the Policy and controlling law. If the victims' deaths arose from a single "occurrence," then Century's $1,000,000 limit has been met and Admiral is responsible

3

1 for covering the remainder of the settlement amounts.  On the other hand, if the deaths resulted
2 from multiple "occurrences," then Century's aggregate limit of $2,000,000 would apply and
3 Century would be obligated to make additional payments.

4 **II.     LEGAL STANDARD**

5      Summary judgment is warranted where there is no genuine dispute of material facts such
6 that the court may rule as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*,
7 477 U.S. 242, 250 (1986).  Where there is no dispute of material fact, "the moving party must
8 demonstrate the right to judgment as a matter of law in the context of [the] undisputed facts."
9 *Aronsen v. Crown Zellerbach*, 662 F.2d 584, 591 (9th Cir. 1981).  Here, the parties do not
10 dispute the facts and they ask the Court to rule solely on whether the aggregate limit of the
11 Policy was triggered by the Accident.

12 **III.    DISCUSSION**

13      Nevada has adopted the "causal" approach to determining whether "a particular situation
14 constitutes a single occurrence or multiple occurrences for the purposes of insurance liability."
15 *Bish v. Guaranty Nat'l Ins. Co.*, 848 P.2d 1057, 1058 (Nev. 1993).  "Under this analysis, the
16 inquiry is focused on whether there was one or more than one cause which resulted in all of the
17 injuries or damages." *Id.*  In *Bish*, a young girl was struck by a car when the car's driver backed
18 over her while leaving a driveway. *Id.* at 1057.  Hearing screams and realizing what she had
19 done, the driver put the car in forward gear and drove over the child again. *Id.*  Each time the
20 driver struck the child, serious injuries arose.  The issue was whether the "underlying
21 circumstances constituted one accident or two for the purposes of collecting under the insurance
22 policy . . . ." *Id.*

23      The *Bish* court held that the separate acts of negligence that each resulted in injuries to
24

4

1  the child arose from a single occurrence.  It stated that injuries arising from multiple "causes" are
2  nonetheless attributable to a single "occurrence" when those causes "act[] concurrently with and
3  [are] directly attributable to" a single first cause. *Id.* at 1059.  The court also observed that "[t]he
4  proximity in both time and space of the events at issue, together with their direct
5  interdependence, leads . . . to the conclusion that there was a single accident, and that the sole
6  cause of the accident was [the driver's] negligence." *Id.*

7  In *Washoe County v. Transcontinental Insurance Co.*, 878 P.2d 306, 308 (Nev. 1994), the
8  Nevada Supreme Court emphasized that whether a situation constitutes a single or multiple
9  occurrence is dependent on whether the injuries in question arose from the same proximate
10 cause.  In that case, Washoe County was sued for implementing an inadequate daycare licensing
11 process and then failing to investigate and monitor its licensed daycares, which resulted in
12 approximately forty children being molested at the Papoose Palace Day Care Center. *Id.*  The
13 carriers of the excess insurance coverage argued that each act of molestation should constitute an
14 individual occurrence.

15 The court disagreed, instead finding that each separate instance of molestation arose from
16 the same proximate cause: "namely, the County's alleged negligence in the process of licensing
17 Papoose." *Id.*  The court held that "the County's negligence in the licensing process and in its
18 attendant duties to investigate and monitor Papoose constitute[d] a single occurrence for the
19 purposes of liability." *Id.*

20 The Court finds that these cases, along with the definition of "occurrence" as contained in
21 the Policy, demonstrate that the Accident resulted from a single occurrence.  As in *Bish* where
22 the driver's separate acts of negligence together caused the totality of injuries, in this case there
23 were multiple causes that together formed the fatal conditions responsible for the victims' deaths.
24

5

1   Not only was the pool heater negligently maintained, but the equipment room was also not

2   properly ventilated. The door vents "were covered with cardboard and duct tape. Additionally,

3   there [was] a gap along the case (interior) wall and the ceiling where the gases could escape

4   directly into the room above." (Carbon Monoxide Detection Report, at AIC 0412). Furthermore,

5   the venting system was inadequate in that "the pipe was two feet too short and there was no trap

6   on the top." (*Id.*). Thus, the investigators concluded that "[a]ll these discrepancies contributed to

7   the creation and accumulation of poison gas." (*Id.*).

8   Also like *Bish* where the causes of injury occurred in rapid succession, the proximity in

9   time and space of the events in this case leads to the conclusion that they comprise a single

10  occurrence. The negligent maintenance of the pool heater and pool equipment room generated a

11  lethal amount of carbon monoxide that accumulated in a single place on a specific day—the

12  victims' motel room on April 16, 2006. Moreover, the various reports make it clear that

13  investigators were doubtful whether any one of the "causes" alone would have produced the

14  necessary amount of carbon monoxide to kill the victims. Rather, investigators emphasized the

15  interdependence of each cause to produce the fatal conditions at issue. (*See* Aug. 29, 2006

16  Report, ECF No. 113-6, at AIC 0728–AIC 0730).

17  Admiral, however, contends that three *independent* causes were responsible for the fatal

18  level of carbon monoxide in the victims' room: "1) the heater was not burning properly, 2) the

19  roof vent was not the proper height and the roof vent cap had been removed, and 3) the vents in

20  the door to the pool equipment room had been covered." (Admiral Mot. Summ. J. 8, ECF No.

21  113). Admiral argues that because these separate causes are each independently identifiable and

22  contributed to the fatal conditions, they must each constitute a separate occurrence under the

23  Policy. To support this contention, Admiral cites *Insurance Company of the State of*

24

6

*Pennsylvania v. National Fire & Marine Insurance Co.*, No. 2:11-cv-02033-PMP, 2012 WL 4482674 (D. Nev. Sept. 26, 2012) ("*National Fire*").

In *National Fire*, the court considered whether independent defects in the structural components and electrical and plumbing systems of a condominium building constituted multiple occurrences such that the primary insurance provider's aggregate limit applied to the damage. 2012 WL 4482674, at *3. The court held that the various causes constituted multiple occurrences under the insurance policy because the expert reports identified independent defects in the structure, electrical system, and plumbing system, "all of which independently caused damages." *Id.* at *4. The defects in question each contributed some degree of damage that was identifiable and measurable. *Id.* The defects in the roof led to water intrusion resulting in damage to the substrates and building interiors, the defects in the electrical installations resulted in faulty wiring and code violations, and the faulty plumbing led to the improper installation of toilets, bathtubs, and showers. *Id.* The court concluded that the alleged damage could not be attributed to "one common cause." *Id.*

Unlike the damages in *National Fire* that arose from independent causes, this case presents one common cause of the victims' deaths—carbon monoxide poisoning. The fact that the fatal conditions in this case were the result of more than one contributing cause does not undermine that conclusion. Unlike the structural, electrical, and plumbing issues discussed in *National Fire* that each produced a separate harm, the various causes of the carbon monoxide identified by Admiral did not result in damage independent and apart from one another. Quite the opposite. The faulty heater, the missing ventilation, and the sealed vents together produced the fatal conditions. Had even one of these elements been absent on April 16, 2006, there is no evidence that lethal levels of carbon monoxide would have spilled into the victims' room.

Finally, as Century points out, the language in the Policy states that a single "occurrence" arises if the bodily injury is caused by exposure to "substantially the same general harmful *conditions*." (Century Policy, at AIC 0046 (emphasis added)).  Even if the various defects identified by Admiral are considered individual "causes" of the victims' deaths, there can be no question that these causes taken together still constitute the same general harmful conditions. Each "cause" had a role in producing, trapping, and channeling a lethal amount of carbon monoxide into the victims' room.  Thus, although the defects may have individually contributed, the proximate cause of the deaths in this case was Casino West's negligence in failing to properly maintain the heater and equipment room. *Washoe Cnty.*, 878 P.2d at 308.  Under the Policy and Nevada law, this constitutes a single "occurrence."

Therefore, Century's Motion is GRANTED and Admiral's Motion is DENIED.  Admiral is responsible for paying the settlement and judgment amounts in excess of Century's single occurrence limit.

## CONCLUSION

IT IS HEREBY ORDERED that Century's Motion for Summary Judgment (ECF No. 112) is GRANTED.

IT IS FURTHER ORDERED that Admiral's Motion for Summary Judgment (ECF No. 113) is DENIED.

IT IS SO ORDERED.

Dated: _March 27, 2015

_____
ROBERT C. JONES
United States District Judge

8